UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEE BOWERS; BRANDON BUCCI; DARIUS MCDOWELL; JAMES WALKER, on behalf of themselves, and all others similarly situated | : : : : | C.A. No. |
| Plaintiffs | : | |
| v. | : : | CLASS ACTION Jury Trial Demanded |
| CITY OF PHILADELPHIA; LEON A. KING, II, individually and in his official capacity as Commissioner, Philadelphia Prisons; SYLVESTER JOHNSON, individually and in his official capacity as Commissioner, Philadelphia Police Department; JOHN DOE and RICHARD ROE, unknown Prison and Police Officials and Officers, in their individual capacities, Defendants | : : : : : : : : : : : : | |

**COMPLAINT**

**Introduction**

1. This is a class action for injunctive and declaratory relief and for damages for the named individual plaintiffs and the class they represent to secure relief from the pervasive and chronic unconstitutional conditions of confinement that exist and which, absent judicial intervention, will continue to persist at local police districts, the Police Administration Building ("PAB"), and at intake units of the Philadelphia Prison System ("PPS"). Due to severe overcrowding and the lack of adequate facilities in which to house inmates in the PPS, persons who are arrested in Philadelphia and held in lieu of bail, post-preliminary arraignment, for detention at PPS are held at police districts or the PAB for periods up to several days, and/or are

held in the intake/admissions areas of the PPS for even longer periods of time. During this process, these inmates, nearly all of whom have only been charged with crimes and are presumed innocent, are held in dangerous, unsanitary, severely overcrowded, degrading, and cruel conditions of confinement. At the police districts, there is no access to counsel or family, and inmates are held in cells without beds and without access to showers and other necessary hygienic facilities. Thereafter, at the PPS, inmates are confined for days in holding cells before they receive medical screening. They have no access to counsel or family and are held in severely overcrowded conditions without beds or access to showers and other necessary hygienic facilities. It is not unusual for 25-30 persons to be confined, day after day, in cells of less than 175 square feet pending their transfer into general population. An increasing number of the plaintiff class are also denied their right to a timely preliminary hearing due to their inability to confer with counsel and the inability of the defendants to send them to court. In sum, the conditions are so harsh and degrading, and so dangerous to the health and safety of the inmates, as to constitute cruel and unusual punishment under the Eighth Amendment and a denial of liberty without due process of law under the Fourteenth Amendment.

## Jurisdiction

2. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§1331, 1343, 42 U.S.C.§§ 1983 and 1988, and the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

3. This Court has supplemental jurisdiction pursuant to 28 U.S.C.§ 1367(a).

## Parties

4. Plaintiffs Lee Bowers, Brandon Bucci, Darius McDowell, and James Walker are

Case 2:06-cv-03229-RBS   Document 1   Filed 07/24/06   Page 3 of 13

residents of the Commonwealth of Pennsylvania and are currently or were held in confinement, awaiting hearings or trials in police districts, the PAB, or in the intake/admissions areas of the PPS subject to the conditions of confinement that are alleged in this Complaint. The individual plaintiffs sue on behalf of themselves for damages that resulted from the practices and policies of the defendants, and they sue on behalf of themselves and on behalf of those who currently are or will in the future be subject to these unconstitutional conditions of confinement for injunctive and declaratory relief and for damages.

5. Defendant City of Philadelphia is a political subdivision of the Commonwealth of Pennsylvania and operates and funds the Philadelphia Police Department and the Philadelphia Prison System.

6. Defendant Leon A. King, II, is the Commissioner of the Philadelphia Prison System and is sued individually and in his official capacities.

7. Defendant Sylvester Johnson is the Commissioner of the Philadelphia Police Department and is sued individually and in his official capacities.

8. Defendants John Doe and Richard Roe are officials and officers of the Philadelphia Police Department and the Philadelphia Prison System who personally subjected the named plaintiffs to the conditions alleged in this Complaint.

9. At all relevant time, all defendants acted under color of state law.

**Factual Allegations**

**A. History of Unconstitutional Conditions at the Philadelphia Prisons**

10. In two related civil rights actions, *Jackson v. Hendrick*, C.P. Philadelphia, February Term, 1971, No. 2437, and *Harris v. City of Philadelphia,* E.D. Pa., No. 82-1847, begun in 1971

and 1982, respectively, state and federal courts ordered the Philadelphia Prison System to implement a series of measures to remedy conditions of confinement that violated the United States and Pennsylvania Constitutions.  According to the findings of the three-judge *Jackson* court, which were sustained on appeal, and the allegations of the *Harris* Complaint, which supported a series of court-approved consent decrees, PPS inmates, the large majority of whom were awaiting trial, were subjected to unhealthy, unsafe, and degrading conditions of confinement due, in significant part, to the fact that the resources of the PPS, including housing, security staff, medical care, food, sanitation, and programming, were overwhelmed by the number of inmates in custody.

11. Between them, the *Jackson* and *Harris* courts mandated physical plant improvements, enhancements in medical care and sanitation, the construction of new jails and a courthouse to increase capacity and expedite dispositions, the adoption and implementation of physical and operational standards and policies and procedures affecting conditions of confinement, and the establishment of alternatives to incarceration, including diversion of inmates into drug treatment programs.  The *Harris* Court also ordered a qualified moratorium on the admission of untried persons so long as the PPS population exceeded the inmate capacity, as determined by PPS.

12. The *Harris* litigation was terminated in 2000 with the entry of a final Settlement Agreement in which the City of Philadelphia agreed to fund for a period of two years the cost of independent consultants to monitor the PPS's compliance with PPS Physical and Operational Standards and PPS Policies and Procedures governing all aspects of conditions of confinement. The City also agreed to implement specified physical improvements to the House of Correction

on a prescribed schedule. At the time that the *Harris* litigation was terminated, the population of the PPS was approximately 7,000 inmates, and the Court's approval of the parties' settlement was qualified with the expression of concern that without judicial oversight, the population, which had nearly doubled over the life of the litigation, would continue to increase beyond the physical capacity of the PPS.

13.  The *Jackson* litigation was terminated in 2001 following 30 years of court supervision that included repeated and specific findings of unconstitutional conditions, a progression of consent decrees, and the release of inmates.

14.  In terminating *Jackson*, the City of Philadelphia agreed that upon the opening of a new Women's Detention Facility and the Cambria Correctional Center, and as long as the population did not exceed 950 women and 6850 men (a total of 7800), the City would hold the population in the dormitories at Detention Center ("DC") to 192, remove all inmates from the dayrooms and annex areas at DC, eliminate all triple celling, and would house no more than four inmates per multi-occupancy room at the Curran Fromhold Correctional Facility ("CFCF").

15.  In the five years following the termination of *Harris* and *Jackson*, the population of the PPS has steadily increased, and the increase in the number of inmates has far exceeded the additional housing capacity provided by a new women's facility, the Riverview Correctional Facility. In June, 2006, the population reached 8,900 inmates, over 1,000 beyond the rated capacity of the PPS.

16.  To house the current population, the prison defendants have instituted triple-celling in the House of Corrections, placed over 250 inmates in dormitory areas at the DC that are meant to hold no more than 192, and resorted to housing inmates in common spaces and recreation

areas in other facilities which are now crowded well beyond their capacity.

17.  Further, because the defendants have not provided a sufficient number of correctional officers and other staff, they have resorted to "lock-downs" and "restricted movements" at each of the facilities on a regular basis.  These practices have made conditions of confinement even more intolerable, as they deprive inmates of recreation, movement, and services.  At the same time, these practices increase dangers to inmates and staff, including correctional officers, due to the significant increase in tension and disputes that result when inmates are deprived of movement, recreation, and exercise.

### B.  The Current Overcrowding Crisis

18.  In 2006, the population at the PPS has ranged up to 8,900 inmates.  Since 2000, the population has increased by 25%, without a commensurate increase in physical capacity, staffing, or other resources essential to constitutional conditions of confinement.

19.  Based on the factors that contribute to the population size at PPS, the population will continue to expand at this rate in the coming months and years.  Indeed, as an historical matter, yearly population peaks during the late summer months of August and September.

20.  Even with triple-celling, the overuse of dormitory space at the DC, the use of common and recreation areas and restricted movements and lock-downs of the general population, the City has been unable to provide even deficient housing for all persons committed to the prisons.

21.  In early 2006, as the PPS literally ran out of housing space, the PPS instituted a policy and practice of holding inmates at the intake/admissions area of the DC, the Philadelphia Industrial Correctional Center ("PICC"), and/or CFCF until a cell was available in medical

quarantine or in the general population.

22. Pursuant to this official practice and policy, inmates have been held at these areas well beyond the outside limits mandated by PPS Policies and Procedures and for periods up to six days, in conditions that are dangerous, degrading, threatening to life, safety and health, and which are in violation of the Sixth, Eighth and Fourteenth Amendments.

23. Specifically, the following conditions have been prevalent during the last several months:

(a) At the intake/admissions areas at DC and PICC, there is no admissions process in effect; rather, these areas (holding cells without beds, adequate toilets, access to showers, access to visits or to counsel) have been used as staging areas before transfer to the official intake/admissions unit at CFCF.  Inmates held at DC or PICC awaiting intake processing, are provided no services, are not medically screened, and can sleep, if at all, on concrete floors. Defendant Commissioner of Corrections has disclaimed the use of these areas in the future, but there is no legal bar to the re-opening of these facilities.

(b) At the official intake/admissions area at CFCF, similar conditions prevail.  In this area, there are several holding cells, with metal benches, but no beds and a single toilet/sink in each holding cell.

( c) The holding cells at CFCF were built and are operated to permit processing of new inmates into the system over a period of no more than three days.  During this time, new inmates should be detained with no more than 5-10 others, as they are interviewed, screened by medical personnel, and given initial classifications.  They should then placed in a medical quarantine until cleared by medical personnel for general population housing.

(d) Due to the severe overcrowding, the capacity of the holding cells at CFCF is regularly exceeded, and up to 25-35 men are placed in these cells with no place to sit, sleep, or use toilet facilities with any privacy.  Moreover, because of the high number of inmates, medical screening is delayed for up to a week and inmates with communicable diseases are in close proximity with others for up to 100 hours.  At the same time, inmates with immediate medical needs (e.g., persons with diabetes and those in need of prescription medications) are not always able to receive timely issuance of medication, food, and drinks.  Due to the long periods of confinement in areas with no room to move, exercise, shower, or even to brush one's teeth, friction is a constant and fights inevitable.  The more intense the overcrowding, the greater the potential for violence.

24. Due to the dangerous and degrading conditions in the PPS intake/admissions areas, as set forth <u>supra</u>, the defendant Commissioner of Corrections has instituted a policy of not accepting new inmates from the Police Department, post-preliminary arraignment, whenever the population exceeds 8,750.

25. As a result, persons who are unable to post bail after their preliminary arraignment have been held at police districts or the PAB under the authority of defendant Police Commissioner, for days, pending admission to the PPS.  During this time period, they are provided emergency medical care only; they have no access to phones, family, or legal counsel; they are confined in holding cells with no showers, adequate toilet facilities or places to sleep; and they are subjected to random acts of violence by other inmates.  These holding cells were not designed nor are they equipped or staffed to hold persons post-preliminary arraignment for the periods of time that plaintiff class members have been and will be held in the future, in the

absence of judicial relief.

26. In a number of cases, persons held at the Police Department and thereafter at PPS intake/admissions, under the authority of the defendant Police Commissioner, are unable to consult with legal counsel prior to the date of their preliminary hearings in state criminal proceedings. As a result, they are denied their right to counsel, to a timely preliminary hearing and, in cases where the Commonwealth would be unable to present probable cause to hold them for trial, to be discharged from custody. Indeed, delays in processing have been so acute, that inmates scheduled for preliminary hearings in their criminal case are not even transported to court.

27. The current crisis cannot be met by measures that simply shift the overcrowded conditions from holding cells at the PPS to holding cells at the Police Department. The holding facilities at the Police Department are, if anything, even more degrading, dangerous, and inadequate with respect to the provision and delivery of necessary services and protections to incarcerated persons. As of July 20, 2006, the PPS was not accepting new inmates and over 300 persons were awaiting admission to PPS, but are being held for days at police districts.

## Allegations as to the Individual Plaintiffs

28. Plaintiff Lee Bowers was arrested on June 23, 2006 on a bench warrant from Family Court and immediately taken to CFCF, intake/admissions. He was held in this area as a detainee until his release from custody by court order on June 26, 2006, in conditions that were degrading, dangerous, and pervasively unconstitutional. He was in a holding cell with 25-30 other inmates, with a single toilet, no beds, no showers, no tooth brush or other personal hygiene materials, no access to medical care or medical screening, and no access to counsel or to phone calls.

29. As a result of these conditions, plaintiff Bowers was forced to go 72 hours without sleep, and because of the overcrowded conditions had to fold his body under a steel bench, causing a blood clot in his leg. Upon release from CFCF, plaintiff Bowers was hospitalized for three days for the blood clot condition and will need continued medical care to treat this life threatening condition.

30. Plaintiff Brandon Bucci was held at CFCF from June 21-27, 2006 in the intake/admissions area. He was held as a detainee in this area until his release on bail on June 26, 2006, in conditions that were degrading, dangerous, and pervasively unconstitutional. He was in a holding cell with 25-30 other inmates, with a single toilet, no beds, no showers, no tooth brush or other personal hygiene materials, no access to medical care or medical screening, and no access to counsel or to phone calls.

31. Plaintiff Darius McDowell was arraigned on June 14, 2006 and held at the police district for two days. Upon arrival at CFCF on June 14, 2006 he was held in the intake/admissions area until June 20, 2006. He was held as a detainee in this area until his release on bail on June 21, 2006, in conditions that were degrading, dangerous, and pervasively unconstitutional. He was in a holding cell with 25-30 other inmates, with a single toilet, no beds, no showers, no tooth brush or other personal hygiene materials, no access to medical care or medical screening, and no access to counsel or to phone calls.

32. Plaintiff James Walker was held post-preliminary arraignment at the Police Department and is currently in an intake/admissions unit at PPS.

**Class Action Allegations**

33. Plaintiffs seek to represent a class of all persons on claims of declaratory and

injunctive relief and for damages, who have been or will in the future be held in custody post-preliminary arraignment at the Philadelphia Police Department or PPS and who have been or will be subjected to the policies and practices alleged in this Complaint.  The class is so numerous that joinder of their claims is impracticable.

34.  Plaintiffs' claims are typical of the claims of the class members, in that each member of the class has suffered the same harms as a result of the defendants' acts and omissions.  Plaintiffs will be adequate representatives of the class, in that they are represented by competent and skilled counsel whose interests are fully aligned with the interests of the class.

35.  There are questions of law and fact common to the class, and specifically whether defendants' practices and procedures, which force confinement of all members of the plaintiff class in the same overcrowded, unsanitary and dangerous conditions, violate the Eighth and Fourteenth Amendments to the U.S. Constitution.  The policies and practices of the defendants and the resulting conditions of confinement are the same for all members of the plaintiff class.

36.  The questions of fact and law that are common to the members of the class predominate over any questions affecting any individual members of the class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

37.  The defendants have acted, or refused to act, on grounds generally applicable to the class.  Final injunctive and declaratory relief is appropriate with respect to all of the members of the class.

38.  This action may properly be maintained under Fed.R.Civ.P. 23 (a), and (b)(1)(2) and (3).

**Count I–Federal Constitutional Violations**

39. Plaintiffs incorporate by reference paragraphs 1-38, as if fully set forth in this paragraph.

40. The practices, policies, acts and omissions alleged in this Complaint are in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution in that they deprive plaintiffs and members of the plaintiff class their rights to be free from deprivations of liberty without due process of law, to access to counsel, to a speedy trial, to be free from cruel and unusual punishment, and to the provision of necessary medical care.  If appropriate declaratory and injunctive relief that is necessary to correct the unconstitutional conditions of confinement is not granted, the harms suffered will be irreparable, as the unconstitutional policies, practices and conditions will continue to exist for the foreseeable future.

## Count II-State Law Claims

41. Plaintiffs incorporate paragraphs 1-40 by reference as if fully set forth in this paragraph.

42. The policies, practices, and conditions alleged in this Complaint deprive plaintiffs of their rights under the Pennsylvania Constitution and the laws of the Commonwealth of Pennsylvania to be free of deprivations of liberty without due process of law, intentional infliction of emotional distress, negligence, and recklessness.

## Relief

Wherefore, plaintiffs request the following relief:

1. For the named plaintiffs and members of the plaintiff class, compensatory and punitive damages for the injuries and damages caused by the acts and omissions of the defendants;

2. For the named plaintiffs and the members of the plaintiff class, a declaratory judgment

that the practices, policies, and conditions alleged in this Complaint are unconstitutional;

    3. For the named plaintiffs and the plaintiff class, a permanent injunction prohibiting the defendants from the implementation or application of the policies and practices alleged in this Complaint, and specifically an Order requiring the defendants to either provide the plaintiff class with constitutionally acceptable conditions of confinement, medical care, screening, and medication, access to legal counsel, placement in habitable cells, with adequate showers, toilets and other necessary personal hygiene, and protection from assaults or other dangers to their life or safety, or discharge the members of the class from custody.

    4. Reasonable attorney's fees and costs;

    5. All other appropriate relief.

_____
David Rudovsky, Esq.
I.D. No. 15168
Jonathan H. Feinberg, Esq.
I.D. No. 88227
KAIRYS, RUDOVSKY,
MESSING & FEINBERG, LLP
718 Arch Street, Suite 501S
Philadelphia, Pa. 19106
(215) 925-4400

_____
Angus Love, Esq.
I.D. No. 22392
Su Ming Yeh, Esq.
I.D. No. 95111
Institutional Law Project
718 Arch Street, Suite 304S
Philadelphia, PA 19106

Counsel for Plaintiffs