IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEE BOWERS, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 06-3229 |
| CITY OF PHILADELPHIA, et al. | : | |

**SURRICK, J.**                                                                                                                         **DECEMBER 12, 2008**

## MEMORANDUM & ORDER

Presently before the Court is the City's Motion for Summary Judgment. (Doc. No. 164). For the following reasons, the Motion will be granted in part and denied in part.

## I. INTRODUCTION

Plaintiff Lee Bowers ("Plaintiff") alleges overcrowding and unconstitutional conditions of confinement in the Philadelphia Prison System (the "PPS"). The City of Philadelphia (the "City") has been dealing with the overcrowding conditions in the PPS for decades. In a Memorandum Opinion, dated January 25, 2007, we noted that "it is clear that overcrowding and its consequences have plagued the PPS at-large and its intake units, in particular, for years." (Doc. No. 94 at 6.) We recounted the long history of court involvement in the overcrowding crisis in Philadelphia's prisons that began in 1971, continued through the 1980s, and did not end until a court-approved final settlement agreement in 2000. The settlement was approved because the City promised to limit the prison population and/or create additional housing space for an inevitably increasing population. *See Harris v. City of Phila.*, No. 82-1847, 2000 WL 1239948, at *18-19 (E.D. Pa. Aug. 30, 2000). Six years after the settlement and the City's promises to take action, the Complaint was filed in this case raising nearly identical claims of unsafe and unsanitary conditions resulting from overcrowding. The prison population has continued its

pattern of growth from roughly 7,000 inmates in 2000, *see id.* at *5, to nearly 9,000 inmates in January of 2007 when we issued the Memorandum. (*See* Doc. No. 94.) The total capacity of the PPS is 8,948. (Prelim. Hr'g Ex. P-13.) There is an expected minimum yearly increase in the prison population of three percent, and every summer between the months of May and October there is a spike in the prison population. (Prelim. Hr'g Ex. P-5; Prelim. Hr'g Tr., Oct. 4, 2006, morning session, at 95.) The growth in the prison population and the annual spikes in the population have been entirely predictable. Nevertheless, as we noted in the Memorandum, the City appears to have taken no steps to substantially increase the inmate capacity of the prison system.

Most recently, in April of this year another lawsuit was filed alleging unconstitutional conditions at the PPS. *See Williams v. City of Phila.*, No. 08-1979 (E.D. Pa. Apr. 28, 2008). The Complaint in *Williams* alleges that the prison population is now more than 9,300 inmates and that as a result of the overcrowded conditions inmates are being subjected to dangerous, unsanitary, degrading, and cruel conditions of confinement. The Complaint further alleges that prison authorities are attempting to alleviate some of the problems caused by overcrowding by "triple-celling" inmates, that is, placing three inmates in a jail cell that was designed for only two. In the January 25, 2007 Memorandum, we discussed the practice of triple-celling and warned that the practice was problematic and certainly was not a permanent solution to the overcrowding problem. (*See* Doc. No. 94 at 53.)

II.     FACTUAL BACKGROUND

Plaintiff alleges that he suffered injury at the PPS as a result of the overcrowded conditions in the intake center from June 23, 2006, through June 26, 2006. (Doc. No. 34 ¶¶ 21-

24, 26-28.) On July 24, 2006, Plaintiff and others filed a class action Complaint against Defendants City of Philadelphia; Leon A. King, II, individually and in his official capacity as Commissioner of the Philadelphia Prisons; Sylvester Johnson, individually and in his official capacity as Commissioner of the Philadelphia Police Department; and John Doe and Richard Roe, unknown Prison and Police Officials and Officers, in their individual capacities. (Doc. No. 1.) At the same time, Plaintiffs filed a motion for a preliminary injunction seeking to correct conditions at the Philadelphia Police Administration Building ("PAB"), the intake unit of the PPS, and at the Curran-Fromhold Correctional Facility ("CFCF"). (Doc. No. 2.) Plaintiffs sought relief in the form of a judgment declaring that the practices, policies, and conditions as alleged in the Complaint are unconstitutional, and a permanent injunction prohibiting the continuation of such unconstitutional conditions. (*Id.*) Plaintiffs also sought compensatory and punitive damages. (*Id.*)

On September 13, 2006, Plaintiffs filed an amended Complaint. (Doc. No. 34.) The amended Complaint contains two counts. Count I alleges violations of the Sixth, Eighth, and Fourteenth Amendment right "to be free from deprivations of liberty without due process of law, to access to counsel, to a speedy trial, to be free from cruel and unusual punishment, and to the provision of necessary medical care." (*Id.* ¶ 49.) Count II alleges violations of the right to be free of deprivations of liberty without due process of law under the Pennsylvania Constitution. (*Id.* ¶ 51.) In addition, Count II alleges state law claims of intentional infliction of emotional distress, negligence, and recklessness. (*Id.*)

On January 25, 2007, we entered a Preliminary Injunction. (Doc. No. 94.) We made findings of fact and conclusions of law based upon the evidence and testimony presented at the

evidentiary hearing as well as tours that we conducted of the prison facilities. (*Id.* at 3.) We stated that the conditions that existed in the intake unit at CFCF, in the detention unit of the PAB, and in the holding cells in the Philadelphia Police Districts during the summer of 2006 violated Plaintiffs' constitutional rights. (Doc. No. 94.) We issued an Order detailing the unconstitutional conditions that we found, which included the holding of post-arraignment detainees for days in holding cells in numbers that far exceeded the capacity of the cells, the failure to provide beds and bedding, the failure to provide materials for personal hygiene, the failure to provide for the medical needs of detainees, the failure to timely classify detainees in the intake unit at the CFCF, and the lack of fire safety protection at the PAB and in the Police Districts. (*Id.*) We ordered the City to take immediate affirmative steps to redress these conditions. (*Id.*)

On August 30, 2007, Plaintiffs and Defendants moved jointly to terminate the preliminary injunction so that the parties could enter into a private settlement agreement that would continue the monitoring of the prisons without federal court supervision. (Doc. No. 148.) On October 10, 2007, we granted that joint motion, terminated the preliminary injunction, and dismissed the class claims. (Doc. No. 151.) After the October 10, 2007 Order, the only claims remaining were the § 1983 damages claims and the state law claims of the individual Plaintiffs. At this point, the only claims that remain are the § 1983 claims and the state law claims asserted by Plaintiff Lee Bowers against Defendants City of Philadelphia and Commissioner King in his official capacity.[1] (Doc. No. 165 at 1.) Plaintiff seeks money damages under 42 U.S.C. § 1983

---

[1] "Claims asserted against governmental officials in their official capacities are, in essence, claims brought against the municipality of which the official is an agent." *Cruz v. City of Phila.*, No. 07-0493, 2007 WL 4190690, at *4 (E.D. Pa. Nov. 21, 2007) (citations omitted);

for the unconstitutional conditions in the intake center of the PPS that caused him to suffer a blood clot in his left leg. (*See* Doc. No. 1; Doc. No. 34 ¶ 29; Doc. No. 164 at 1.) Defendants have moved for summary judgment on Plaintiff's amended Complaint in its entirety. (Doc. No. 164.) Defendants argue that Plaintiff has failed to identify an official policy of the City that caused detainees in the prison system to be subjected to unconstitutional conditions. Defendants argue that Plaintiff cannot identify a custom, policy, or practice of the City that violated Plaintiff's constitutional rights or to which the City was deliberately indifferent. Defendants argue that there is no basis upon which to impose municipal liability on the City.

### III. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of demonstrating that there are no facts supporting the nonmoving party's legal position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Once the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see*

---

*see also Brown v. Montgomery County*, No. 04-5729, 2005 WL 1283577, at *4 (E.D. Pa. May 26, 2005) (noting that "official capacity actions represent another way to sue the municipality of which the officer is an agent" and that "an action brought against both the entity and the public official in his or her official capacity is redundant" (citations omitted)). "Suits brought against government officials in their official capacities are . . . treated as suits brought against the governmental unit of which they are officials." *Mitros v. Borough of Glenolden*, 170 F. Supp. 2d 504, 506 (E.D. Pa. 2001) (*citing Brandon v. Holt*, 469 U.S. 464, 471-72 (1985)).

*also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (explaining that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). "The nonmoving party . . . 'cannot rely merely upon bare assertions, conclusory allegations or suspicions' to support its claim." *Townes v. City of Phila.*, No. 00-0138, 2001 WL 503400, at *2 (E.D. Pa. May 11, 2001) (*quoting Fireman's Ins. Co. v. DeFresne*, 676 F.2d 965, 969 (3d Cir. 1982)). Rather, the party opposing summary judgment must go beyond the pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. When deciding a motion for summary judgment, we must view facts and inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995). However, we must not resolve factual disputes or make credibility determinations. *Siegel Transfer*, 54 F.3d at 1127.

## IV. DISCUSSION

Plaintiff alleges a federal constitutional claim under *Monell v. New York City Department of Social Services*, 436 U.S. 658, 694 (1978). Plaintiff also alleges state law claims under the Pennsylvania Constitution and under theories of intentional infliction of emotional distress, negligence, and recklessness.

### A. Municipal Liability under *Monell*

The parties correctly view Plaintiff's federal constitutional claim through the lens of *Monell* and its progeny. *See Monell*, 436 U.S. at 694. Under *Monell*, a municipality cannot be subjected to liability solely because injuries were inflicted by its agents or employees. *See id.* Rather, "it is when execution of a government's policy or custom, whether made by its

lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* There must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation" to ground municipal liability. *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 250 (3d Cir. 2007) (*citing City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

The Court of Appeals for the Third Circuit has observed that there are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983:

> The first is where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy. The second occurs where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself. Finally, a policy or custom may also exist where the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.

*Id.* (*citing Natale v. Camden County Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (internal quotation marks and citations omitted)).

A government policy or custom "can be established in two ways." *Id.* (*citing Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990)). Plaintiff may establish a government policy by showing that a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issued an official statement of policy. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Plaintiff may establish that a course of conduct constitutes a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and

well settled" that they operate as law. *Jiminez*, 503 F.3d at 250 (*citing Monell*, 436 U.S. at 690). Plaintiff has the burden of showing that a government policymaker is responsible by action or acquiescence for the policy or custom. *Id.* (*citing Andrews*, 895 F.2d at 1480). At a minimum, "the government must act with deliberate indifference to the purported constitutional deprivation in order to ground liability." *Id.* (*citing San Filippo v. Bongiovanni*, 30 F.3d 424, 445 (3d Cir. 1994)).

Plaintiff asserts that "[t]he record in this case provides compelling evidence that the City's policies, practices, and customs caused the unconstitutional conditions to which Plaintiff was subjected in June, 2006 and that the City acted with deliberate indifference to Plaintiff's due process rights." (Doc. No. 166 at 2.) Plaintiff proffers evidence that Defendants had knowledge of the overcrowding problem in the PPS – including overcrowding in the Intake Unit where Plaintiff was confined – in the years prior to Plaintiff's incarceration in 2006.[2] (Prelim. Hr'g Tr., Oct. 4, 2006, morning session, at 92, 94.) For instance, at the preliminary injunction hearing Commissioner King testified that he was aware in 2002 that various courts had expressed concern about the conditions of confinement in the PPS. (*Id.*) Plaintiff points to the *Jackson v. Hendrick* litigation in the Pennsylvania state courts that began in 1971 and continued for more than twenty-five years. (Doc. No. 166 at 3.) In *Jackson*, inmates in the City's prison system alleged that their conditions of confinement violated their constitutional and statutory rights. *See* 764 A.2d 1139, 1141 (Pa. Commw. Ct. 2000) (reciting case history). Plaintiff also points the *Harris v. City of Philadelphia* litigation in federal court that began in 1982 and continued for

---

[2] Defendants concede that "it is helpful to look at the conditions . . . prior to June of 2006," even though Plaintiff's amended Complaint is "strictly limited" to a later time period. (Doc. No. 164 at 19-20.)

eighteen years. *See Harris*, No. 82-1847, 2000 WL 1239948, at *1 (E.D. Pa. Aug. 30, 2000). The inmates in *Harris* made similar allegations of overcrowding and unconstitutional conditions of confinement. Plaintiff contends that this history of overcrowding – and the consent decrees that ensued in the *Harris* and *Jackson* cases – undermines the City's argument "that the oppressive and unconstitutional conditions that existed in June, 2006 at the CFCF Intake Unit somehow emerged without warning or notice." (Doc. No. 166 at 1.)

Plaintiff proffers evidence that Commissioner King was aware of overcrowding conditions in the years preceding Plaintiff's incarceration. For instance, Commissioner King knew of steep rises in the inmate population at the PPS – indeed, the population "always went up" – and knew of his duty to provide that population with constitutional conditions of confinement regardless of the number of inmates. (*Id.* at 95-97, 100.) Commissioner King testified that beginning in May, 2005, and ending sometime in the Fall of 2005, an overflow of prisoners in the PPS was so bad that he had to implement an admissions moratorium for several months. (*Id.* at 106-110.) In October, 2005, the City developed a "24 Point Plan" to reduce the prison population. (*Id.* at 150-152.) Plaintiff asked Commissioner King about the "24 Point Plan" during direct examination at the preliminary injunction hearing:

> Q: Okay, so this was a plan or initiative that was started just this summer.
> A: No, this was a plan or initiative that actually was started in October of '05.
> Q: All right, and that was because even as early as October of '05 you, the prison system, and the City knew there was a problem with the population of the prisons, that at some point the jails would be full, there'd be no beds, and you'd have a crisis.
> A: Yes.
> Q: Isn't that correct?
> A: Yes.

(*Id.* at 152-53.) Commissioner King testified that the plan "was just another thing along in that

continual process over the past four or five years, where we all sat down and said, 'you know, we need to see if we can't pick up the pace of what we're trying to do here.'" (*Id.* at 153.) The evidence and testimony presented at the preliminary injunction hearing clearly established that Commissioner King and other City officials were painfully aware that at least for "the past four or five years" they needed to "pick up the pace" to avert a "crisis."

By June, 2006, the jails were "full" and the atmosphere in the PPS was "just too tense to allow the flow to increase." (*Id.* at 108.) Thus, the PPS again implemented an admissions moratorium because of overcrowding. (*Id.*) The admissions moratorium in 2006 was similar to the 2005 moratorium. (*Id.* at 109-10.) Commissioner King testified that the prison population continued to increase even after Defendants initiated a plan to deal with overcrowding. (*Id.* at 150-51.) It is interesting to note that the plan was not implemented until after Plaintiff brought the instant lawsuit. (*Id.* at 149-50.) Meanwhile, from 2004 to 2006, there were "no other plans" to provide additional prison space except for plans to build a new juvenile facility that would house "about 120" inmates.[3] (*Id.* at 100-101.) Defendants made plans to build the facility but obtained no funding for it at any time before Plaintiff's incarceration. (*Id.* at 98-99.) Defendants also made plans for creating more space for inmates, but by October, 2006, none of those plans had come to fruition. (Prelim. Hr'g Tr., Oct. 4, 2006, afternoon session, at 13-17, 47-51.)

Based upon the evidence and testimony presented at the preliminary injunction hearing, as set forth in the findings of fact in the January 25, 2007 Memorandum, Plaintiff clearly

---

[3] In contrast, the prison population had risen from fewer than 6,700 inmates in 2003 to nearly 9,000 inmates in 2006. (Prelim. Hr'g Tr., Oct. 4, 2006, morning session, at 97-99.) King testified that he knew that the prison population had increased by three to five percent per year since he became Commissioner in 2002. (*Id.* at 92, 100.)

presents genuine issues of material fact for a jury's consideration. *See* Fed. R. Civ. P. 56(e). A reasonable jury could easily find that Defendants were aware of prison overcrowding in the PPS that has existed for many years. Defendants had knowledge of the *Harris* and *Jackson* litigation that spanned nearly three decades. Commissioner King was aware (1) that the prison population continued to increase every year, (2) that he had a duty to provide constitutional conditions of confinement regardless of the number of inmates in the prison population, and (3) that the prison population "always went up," especially in the summer. The City had a prison overcrowding crisis that resulted in unconstitutional conditions. Yet the only concrete plan for additional prison space was a juvenile facility that would hold only 120 inmates. In 2005 and 2006, overcrowding in the PPS was so bad that Commissioner King closed the doors and refused to take additional inmates. It was during the 2006 moratorium on admissions that Plaintiff was incarcerated in the PPS facility. Plaintiff testified that he was placed in a holding cell "packed" with inmates and "people laying [sic] on the floor," and then moved to smaller and smaller cells that were so "cramped" that "you couldn't even breathe in them." (Pl.'s Dep. at 30, 36, 74.) The toilet was "filthy" and "disgusting," and the sink was "pretty much like the toilet." (*Id.* at 75.) The heat was easily "a hundred degrees," and was so stifling that "[w]hen they opened the door, it was . . . a treat." (*Id.* at 76.) Plaintiff slept on the concrete floor under a bench in a position where he "couldn't stretch" his leg, because if he had done so he "would have kicked somebody." (*Id.* at 78.) The conditions as described by Plaintiff were deplorable. A reasonable jury could certainly find that Defendants – though aware of the overcrowding problem in the PPS – failed to take appropriate action, and that Defendants' failure to do so amounted to deliberate indifference. *See Jiminez*, 503 F.3d at 250; *see also Anela v. City of Wildwood*, 790

F.2d 1063, 1069 (3d Cir. 1986) (holding that the city could be held liable under *Monell* for the conditions of plaintiffs' confinement, where "[e]ven if the practices with respect to jail conditions . . . were followed without formal city action, it appears that they were the norm").

### B.     State Law Claims

Plaintiff does not dispute Defendants' assertion that "all state tort claims" alleged in the amended Complaint – which include intentional infliction of emotional distress, negligence, and recklessness – are barred by the Political Subdivision Tort Claims Act (the "PSTCA"), 42 Pa. Cons. Stat. Ann. §§ 8541-8542 (West 2008).  (Doc. No. 164 at 25.)  Plaintiff also does not dispute Defendants' assertion that "there is no private cause of action for money damages under the Pennsylvania Constitution."  (*Id.*)

#### 1.     *Political Subdivision Tort Claims Act*

The PSTCA provides an absolute defense that limits the exposure of political subdivisions to tort liability.  *See City of Phila. v. Gray*, 633 A.2d 1090, 1093 (Pa. 1993) (noting that "the defense of governmental immunity is an absolute defense"); *Pa. Turnpike Com'n v. Nationwide Trucking Servs., Inc.*, 319 F. Supp. 2d 569, 575 (W.D. Pa. 2004) (applying Pennsylvania law) (noting that "governmental immunity is 'an absolute defense' that cannot be waived") (*citing In re Upset Sale of Properties*, 560 A.2d 1388, 1389 (Pa. 1989)).  The PSTCA provides that, "[e]xcept as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person."  42 Pa. Cons. Stat. Ann. § 8541 (West 2008).  There are eight categories of exceptions to the PSTCA's grant of governmental immunity.  *See id.* § 8542(b) (listing categories that may result in the imposition of liability on a

12

local agency); *see also Reid v. City of Phila.*, 957 A.2d 232, 234 (Pa. 2008) (noting that § 8542 provides local agencies governmental immunity from liability for any damages they cause to a person or property and noting exceptions); *Sameric Corp. v. City of Phila.*, 142 F.3d 582, 600 (3d Cir. 1998) (noting same).  The eight categories of exceptions are:  (1) the operation of motor vehicles; (2) the care, custody, or control of personal property; (3) the care, custody, or control of real property; (4) trees, traffic controls, and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; and (8) the care, custody, or control of animals.  42 Pa. Cons. Stat. Ann. § 8542(b).  The exceptions to governmental immunity apply only to "negligent acts," and not to "acts or conduct which constitute[] a crime, actual fraud, actual malice or willful misconduct." *Id.* § 8542(a); *see also City of Phila. v. Glim*, 613 A.2d 613, 617 (Pa. Commw. Ct. 1992) (emphasizing that the statutory exceptions apply only to negligent acts).

      We agree with Defendants' undisputed assertion that "Plaintiff's claim of negligence does not fit under one of the eight exceptions to governmental immunity set forth in [the statute]."  (Doc. No. 164 at 27.)  The only exception that could possibly apply is the exception for the care, custody, or control of real property.  The real property exception is not applicable, however, since Plaintiff does not allege that a defect in the prison building itself caused Plaintiff's injuries or that the prison building was "unsafe for activities for which it is regularly used, intended to be used, or reasonably foreseen to be used."  *Bradley v. Franklin County Prison*, 674 A.2d 363, 366 (Pa. Commw. Ct. 1996); *see also Gaylord v. Morris Twp. Fire Dep't*, 853 A.2d 1112, 1118 (Pa. Commw. Ct. 2004), *appeal denied*, 864 A.2d 1205 (Pa. 2004) (*citing Mascaro v. Youth Study Center*, 523 A.2d 1118, 1124 (Pa. 1987)) (holding that real estate exception applies only to cases where artificial condition of land itself causes injury, not when it

facilitates injury by the acts of others). The prison building was merely the setting in which the City's negligence is alleged to have occurred. *See Bradley*, 674 A.2d at 365 (noting that "the real property exception is narrowly construed"). Plaintiff does not allege a design deficiency with the prison building, and indeed, but for the City's overcrowding problem, there appears to be nothing wrong with the building itself or its maintenance. *See id.* at 366. Rather, Plaintiff alleges a policy or practice of the City in which the City housed more inmates in the prison building than its design intended. *See, e.g.*, *Harding v. Galyias*, 544 A.2d 1060, 1065 (Pa. Commw. Ct. 1988), *appeal denied*, 557 A.2d 727 (Pa. 1989) (holding that conditions in prison facilities may have made it easier for inmates to hang themselves, but the conditions did not cause inmate's death to fall within real estate exception); *King v. City of Phila.*, 527 A.2d 1102, 1104 (Pa. Commw. Ct. 1987), *appeal denied*, 563 A.2d 889 (Pa. 1989) (holding that inmate did not allege defective condition of real property so as to bring claim within the real estate exception when he alleged that the City's policy and procedure of handcuffing inmates to their crutches caused him injury on prison steps). Plaintiff's allegations do not relate to the City's care of the existing prison building and instead relate to the City's indifference to the need to expand inmate capacity or somehow reduce the population at the prison. Thus, governmental immunity attaches, and Plaintiff's negligence claim against the City fails as a matter of law. *See* 42 Pa. Const. Stat. Ann. § 8541; *see also, Zernhelt v. Lehigh County Office of Children and Youth Servs.*, 659 A.2d 89, 91 (Pa. Commw. Ct. 1995) (holding that plaintiff failed to state a claim against local agency for negligent conduct that did not qualify under one of the exceptions); *Burton v. City of Phila.*, 121 F. Supp. 2d 810, (E.D. Pa. 2000) (applying Pennsylvania law) (holding that City was immune from liability under the PSTCA from common

law claims for injuries that inmate sustained as a result of City's alleged failure to adequately treat abscessed tooth); *Schwartz v. County of Montgomery*, 843 F. Supp. 962, 972 (E.D. Pa. 1994), *aff'd*, 37 F.3d 1488 (3d Cir. 1994) (applying Pennsylvania law) (holding that county correctional facility and its employees were immune from negligence claims of an inmate nearly strangled by another prisoner, since claims were not within any of the eight enumerated exceptions to governmental immunity).

Governmental immunity also attaches to Plaintiff's claims of intentional infliction of emotional distress and recklessness. The negligence exceptions do not apply to intentional conduct. *See Weaver v. Franklin County*, 918 A.2d 194, 200 (Pa. Commw. Ct. 2007), *appeal denied*, 931 A.2d 660 (Pa. 2007) (holding that county was immune from liability for inmate's claim of intentional infliction of emotional distress); *Wakshul v. City of Phila.*, 998 F. Supp. 585, 588 (E.D. Pa. 1998) (applying Pennsylvania law) (granting summary judgment since intentional infliction of emotional distress did not fall within enumerated exceptions to immunity); *Zernhelt*, 659 A.2d at 91 (holding that plaintiff failed to state a claim for intentional infliction of emotional distress, and noting that § 8542 does not provide exceptions for intentional conduct); *Tyree v. City of Phila.*, 669 A.2d 487, 491 (Pa. Commw. Ct. 1995) (noting that "reckless" connotes intentional conduct) (citing *Gaul v. Cons. Rail Corp.*, 556 A.2d 892, 898 (Pa. Super. Ct. 1989), *appeal denied*, 571 A.2d 383 (Pa. 1989)).

      2.      *Private Cause of Action under the Pennsylvania Constitution*

"To date, neither Pennsylvania statutory authority nor appellate case law has authorized the award of monetary damages for a violation of the Pennsylvania Constitution." *Dillon v. Homeowner's Select*, 957 A.2d 772, 780 n.11 (Pa. Super. Ct. 2008) (*quoting Jones v. City of*

*Phila.*, 890 A.2d 1188, 1208 (Pa. Commw. Ct. 2006), *appeal denied*, 909 A.2d 1291 (Pa. 2006)). Accordingly, we agree with Defendants' undisputed assertion that Plaintiff's claims for damages under the Pennsylvania Constitution fail as a matter of law. *See Stockham Interests, LLC v. Borough of Morrisville*, No. 08-3431, 2008 WL 4889023, at *10 (E.D. Pa. Nov. 12, 2008) (holding that "there is no private cause of action for damages arising from violations of the Pennsylvania Constitution," and granting defendant's request "to deny any monetary relief arising out of violations of the Pennsylvania Constitution") (citations omitted); *Alvarez v. City of Phila.*, No. 07-0493, 2008 WL 4347529, at *13 (E.D. Pa. Sept. 23, 2008) (granting summary judgment in favor of defendant since "Pennsylvania does not recognize a private right of action for monetary damages for violation of the Pennsylvania Constitution"); *Douris v. Schwieker*, 229 F. Supp. 2d 391, 405 (E.D. Pa. 2002) (explaining that although Pennsylvania courts have not yet addressed the issue, federal courts have consistently held that no private cause of action for damages is available under the Pennsylvania Constitution); *Kelleher v. City of Reading*, No. 01-3386, 2001 WL 1132401, at *3 (E.D. Pa. Sept. 24, 2001) (noting that "the federal courts in this Circuit . . . have concluded that there is no such private cause of action for damages under the Pennsylvania Constitution," and citing cases); *Pendrell v. Chatham Coll.*, 386 F. Supp. 341, 344 (W.D. Pa. 1974) (rejecting Pennsylvania constitutional claim for damages and noting that plaintiff could cite no authority that implies such a cause of action).

## V.     CONCLUSION

For these reasons, we will grant in part and deny in part Defendants' Motion for Summary Judgment.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEE BOWERS, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 06-3229 |
| CITY OF PHILADELPHIA, et al. | : | |

**ORDER**

AND NOW, this 12th day of December, 2008, upon consideration of Defendants' Motion for Summary Judgment (Doc. No. 164), and Plaintiff's response thereto, it is ORDERED as follows:

1. Defendants' Motion is DENIED with respect to Plaintiff's federal constitutional claims; and

2. Defendants' Motion is GRANTED with respect to Plaintiff's state constitutional claim and state law claims for negligence, recklessness, and intentional infliction of emotional distress.

IT IS SO ORDERED.

BY THE COURT:

_____
R. Barclay Surrick, Judge